IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IGNACIO ROSARIO,<br>Inmate No. R09139<br><br>Petitioner,<br><br>v.<br><br>KEVWE AKPORE, Warden,<br>Hill Correctional Center<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No. 13-CV-4194<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION AND ORDER

Ignacio Rosario ("Rosario") has filed a Petition for Writ of Habeas Corpus ("Petition") under the Antiterrorism and Effective Death Penalty Act ("AEDPA," 28 U.S.C. §2254(d)[1]). Rosario challenges his two concurrent 18 year sentences stemming from Illinois state court convictions for (1) aggravated discharge of a firearm at an occupied building, (2) aggravated discharge of a firearm at another person, (3) three counts of aggravated unlawful use of a weapon predicated on (a) the weapon being immediately accessible, (b) Rosario's not having a valid firearm owner's identification card and (c) being a gang member, and (4) unlawful use of a weapon by a felon.

To address Rosario's claims this Court initially ordered respondent Warden

---

[1] All later references to that section will be cited as "Section 2254," omitting the prefatory "28 U.S.C." Rosario's Petition will be cited "Pet. –" and the respondent's Warden's Answer will be cited "Ans. –."

1

Kevwe Akpore ("Respondent") to file an answer to the petition pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts ("Section 2254 Rules"). Although this Court usually automatically grants petitioners the opportunity to file replies under Section 2254 Rule 5(e)[2], in this case the very thorough Answer appears to have provided all of the information needed to address Rosario's claims.

If Rosario nonetheless believes that additional relevant information would call for a different decision, he is free to file a timely motion under Fed. R. Civ. P. 59(e),[3] and this Court will reconsider its decision if necessary. In the meantime this Court denies the Petition in its entirety, subject to the possibility of such a motion.

## Statement of Facts

Under Section 2254(e)(1) the state court's findings of fact are presumptively correct in any federal habeas proceeding. Accordingly this opinion begins with the Illinois Appellate Court's recitation of the facts on direct review of Rosario's conviction (People v. Rosario, No. 2-09-0371, 2011 WL 10099316, at *2-*5 (Ill. App. 2d Dist. June 29)):

---

[2] Section 2254 Rule 5(e) states (emphasis added):

"The petitioner may submit a reply to the respondent's answer or other pleading within a time fixed by the judge."

It has never been clear whether that means a habeas petitioner has the right to submit a reply or whether it means that the judge may order such a reply as needed. In an abundance of caution this Court has most often proceeded with the former reading, but as the text reflects that does not appear to be called for here.

[3] Such a motion would play essentially the same role as a reply under Section 2254 Rule 5(e).

During voir dire, the trial court read the 13–count indictment to the jury and cautioned that "the charges * * * are not to be considered as evidence against the defendant just because he has been charged." The trial court told the jury that "the presumption is just the opposite," that every defendant is presumed to be innocent, that such presumption remains with the defendant throughout every stage of the trial through jury deliberations, and that this presumption is not overcome unless the jury is convinced beyond a reasonable doubt that defendant is guilty. After reading the list of witnesses, the trial court then addressed the jury as follows:

> "Is there anyone who does not accept the principle that the State has the burden of proof of guilt beyond a reasonable doubt?
>
> Is there anyone who does not accept the principle that no inference of guilt arises should the defendant not testify or offer any evidence?
>
> Is there anyone who does not accept the principle that no conclusions or decisions should be drawn [sic ] until jury deliberations begin?
>
> * * *
>
> Is there anyone who does not accept the principle that should the State not prove the defendant guilty beyond a reasonable doubt, it is your duty to sign a not guilty verdict?"

Later, while questioning the first 13 jurors, 6 of whom were ultimately accepted as the first panel, the trial court, the State, and the defense attorneys asked twenty times whether a particular juror understood a particular proposition; for example, the proposition that the State must prove the defendant guilty beyond a reasonable doubt. These questions were posed before the entire venire to different jurors at different times. After the first panel was accepted and dismissed for the day, the voir dire continued. In the course of questioning the second panel, individual jurors were asked four times about whether they understood a particular proposition; the alternate jurors were asked a total of 23 times whether they understood.

At trial, Kwayla Dudley testified that she hosted a party at her home on October 6, 2007, that was attended by several guests including

defendant, whom she knew as "Casper." She testified that after one of the guests, Derrick Barber, spilled a drink on defendant, Dudley asked everyone to leave. She then went upstairs to check on her children. She testified that she then heard shots fired. At first she ducked down, but then she ran downstairs and out the front door with her children. Don Scott, who had been staying at her house, drove her and her children in his car to her mother's house.

Defendant's sister, Richandra Manning, testified that she invited defendant to join her at Dudley's party. Manning was sitting on the deck playing cards when defendant arrived. He was accompanied by their niece, Rosalinda. After defendant went inside, Manning heard yelling coming from the kitchen. Defendant ran out and Manning stood up to see what was going on. At that point, she fell, but she did not recall anything else until she was in the hospital and learned that she had been shot in the abdomen.

Don Scott testified that on the night of the party he was lying on a couch in the living room when he heard a "commotion" in the kitchen and heard Dudley telling people that they had to leave. He saw defendant and a black male, Derrick Barber, in the kitchen. He also saw defendant lift his shirt and display a gun in his waistband. At that point, Barber started to run out of the kitchen. Scott then heard a couple of shots, and he ran out the front door.

Derrick Barber testifed [sic] that he and two brothers, Tommie and Leroy Ward, were present at the party. Barber testified that he was drinking and was "somewhat intoxicated." He was playing cards in the kitchen when he saw a "Hispanic dude." According to Barber, he and defendant had a "friendly" conversation about their tattoos, but a little later Barber accidentally spilled his drink on defendant, who then "got an attitude." Barber stated that Dudley asked him to leave so he went out the front door to his truck which was parked on the driveway.

Barber heard a few sounds like "pop." Then Leroy and Tommie Ward came outside and all three ran after defendant and the girl who was with him. Barber felt a pinch and saw sparks and realized he had been shot in the stomach. Shortly after, an ambulance arrived and took him to the hospital.

On cross-examination, Barber admitted that he had been drinking at the party and was intoxicated by the time these events occurred. Tommie Ward testified that he attended the party at Dudley's and that he knew almost everyone there. He stated that Leroy Ward is his

brother. He stated that he saw Derrick Barber have a brief verbal argument with defendant in the kitchen that lasted "a minute or two." Dudley asked Barber to leave, and Tommie left shortly after. They stayed in the front of the house on the driveway. They heard some sounds like gunshots and Leroy ran around to the front of the house and said that defendant was shooting. Tommie stated that he, Barber, and Leroy ran to the back of the house and saw defendant near a white car. At that point defendant turned around and pointed a gun at them, and Derrick was shot. Tommie tried to chase defendant but couldn't catch him, so he went back and picked up Derrick, who eventually went to the hospital. Tommie went to the police station in the squad car and gave a statement to the police. After he was brought back to the house later that morning, he noticed that he had been shot in the foot.

On cross-examination, Tommie stated that he drank "a fair amount" of alcohol the night of the party.

Aaron Sturdevant, a neighbor, testified that on October 6, around 2 a.m., he was at home in bed but was awake because of noise coming from a party in the neighborhood. As he was thinking about calling the police regarding the noise, he heard gunshots and jumped out of bed to look out his window. He saw a male and a female run out of his neighbor's back yard. He saw the man point a gun back toward the house and saw "muzzle flashes"; then he heard three more shots. The two people then tried to get into a white car parked on the street. Sturdevant saw the man "holding off some African Americans that were coming after him" by pointing the gun at them. When the female could not get the car unlocked, they ran down the street. On cross-examination, Sturdevant admitted that he gave a written statement to police officers on the night of the shooting and that he did not include anything in his statement about seeing the male holding off a group of blacks or that he heard two separate rounds of gunshots being fired.

Sturdevant also stated that he was testifying pursuant to a plea agreement he had made with the State regarding pending charges against him. He agreed to testify truthfully in this case and to plead guilty to one count of violating an order of protection; in exchange, the State would drop another charge against him.

Office Jason Russell, Aurora Police Department, testified as an expert in the area of gangs and gang identification. He testifed [sic] that in January 2003 he was assigned to the Special Operations Group that

5

consisted of gangs, narcotics and vice. As a gang officer, he had extensive ongoing training in identification of street gangs, tactics and gang enforcement.

Officer Russell described the representations of different gangs in the Chicagoland area, particularly the Latin Kings. Certain hand signs signify different gangs. On July 8, 2007, Russell was assigned to the Puerto Rican Festival in Aurora. While at the festival, he observed defendant "throw up" the Latin King sign. He approached defendant and asked his name. Defendant replied "I'm King Casper." Defendant told Russell that he had been involved with the Latin Kings for "quite some time." Russell observed a tattoo on defendant's bicep that depicted "Casper the Friendly Ghost" with a five-pointed crown on his head. Russell opined that the five-point crown signified a Latin King affiliation.

Russell identifed [sic] two photographs of defendant with his brother, Christopher Rosario. The photographs showed them shaking hands and using gang signs. Defendant was wearing a gold necklace with a five-pointed crown and a black and gold shirt with several crowns all over it. Another photograph showed defendant's tattoo of "Casper" with the crown and another tattoo on his forearm of the king from a deck of cards with a five-pointed crown. In the same photograph, defendant is wearing a gold hat, which is one of the Latin King's primary colors. Based on all these observations, Russell opined that defendant was a member of the Latin Kings.

The parties stipulated that defendant had a 2004 felony conviction for cocaine possession, that he did not have a Firearms Owner's Identification card, and that he was the driver of the white Cadillac. Defendant's motion for a directed finding was denied. Defendant did not testify.

The jury instructions, given both verbally and in writing, informed the jury that a defendant is presumed to be innocent; that this presumption remained with defendant throughout every stage of the trial; that this presumption is not overcome unless from all the evidence the jury is convinced beyond a reasonable doubt that the allegations are proven; that the State had the burden of proving the allegations beyond a reasonable doubt; and that this burden remains on the State throughout the case. Further, the trial court instructed the jury that defendant was not required to disprove the allegations and the fact that defendant did not testify must not be considered in any way in arriving at the verdict.

The jury found defendant not guilty of two counts of attempted murder of Derrick Barber and Tommie Ward; not guilty of two counts of aggravated battery with a firearm of Derrick Barber and Tommie Ward; not guilty of three counts of aggravated discharge of a firearm toward Derrick Barber, Tommie Ward and Richandra Manning. The jury then found defendant guilty of aggravated discharge of a firearm at an occupied building; aggravated discharge of a firearm at another person; aggravated unlawful use of a weapon based on the weapon being immediately accessible; aggravated unlawful use of a weapon based on no FOID card; aggravated unlawful use of a weapon by a gang member; and unlawful use of a weapon by a felon.

The trial court sentenced defendant to two concurrent terms of 18 years' imprisonment for each count of aggravated discharge of a firearm, and the remaining four counts merged into these convictions.

## Procedural History

On direct appeal of his convictions Rosario argued that (1) he was denied a fair and impartial jury because the trial court failed to comply with Rule 431(b), (2) the trial court erred in failing to limit the use of gang evidence and (3) counsel was ineffective for failing to request a limiting instruction with regard to the gang evidence (Ans. 4). On June 29, 2011 the Illinois Appellate Court rejected each of those arguments and affirmed his conviction (Rosario, 2011 WL 10099316). Rosario next filed a petition for leave to appeal to the Illinois Supreme Court, reiterating the same three arguments, and on May 20, 2012 the Supreme Court denied that petition. Rosario sought no other post-conviction relief in the Illinois state courts, and the time period to seek such relief has passed (Ans. 5). On May 30, 2013 Rosario timely filed the Petition here.[4]

---

[4]Although Rosario did not seek certiorari from the United States Supreme Court on direct review, the 90-day period within which he could have done so is included in calculating the kickoff date for the one-year limitation period under 28 U.S.C. § 2244(d)(1)(A).

7

## Standard of Review

Before a federal court can address the merits of a Section 2254 petition, petitioner must have both exhausted his state remedies and avoided any fatal procedural defaults (Section 2254(b)(1); <u>Perruquet v. Briley</u>, 390 F.3d 505, 513-15 (7th Cir. 2004)). Claims are exhausted "by either (a) providing the highest court in the state a fair opportunity to consider the constitutional issue, or (b) having no further available means for pursuing review of one's conviction in state court" (<u>Wallace v. Duckworth</u>, 778 F.2d 1215, 1219 (7th Cir. 1985) (per curiam)).[5] Procedural default occurs in one of two situations: "(1) [the] claim was presented to the state courts and the state-court ruling against the petitioner rests on adequate and independent state-law procedural grounds, or (2) the claim was not presented to the state courts and it is clear that those courts would now hold the claim procedurally barred" (<u>Perruquet</u>, 390 F.3d at 514).

Any claims that survive those threshold procedural obstacles must then satisfy Section 2254(d)'s stringent requirement for addressing habeas claims that the state courts have considered and rejected on their merits:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[5] Respondent acknowledges that Rosario has met the exhaustion requirement (Ans. 6).

8

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Thus federal courts will not disturb a state court's application of federal law "unless it is both incorrect and unreasonable" (Carter v. Thompson, 690 F.3d 837, 843 (7th Cir. 2012) (internal quotation marks omitted)). " 'Unreasonable' in this context means something like lying well outside the boundaries of permissible differences of opinion" (Thompkins v. Pfister, 698 F.3d 976, 983 (7th Cir. 2012) (internal quotation marks omitted)).

Further, Section 2254(d)'s statutory unreasonableness standard allows "the state court's conclusion to stand if it is one of several equally plausible outcomes" (Woolley v. Rednour, 702 F.3d 411, 425 (7th Cir. 2012) (internal quotation marks omitted)). Simply put, "Federal habeas courts are generally limited to a deferential review of the reasonableness, rather than the absolute correctness, of a state court decision" (Newman v. Harrington, No. 12-3725, 2013 WL 4033893, at *7 (7th Cir. Aug. 9) (internal quotation marks omitted)). As to factual matters, "[t]he state court's factual determinations are entitled to a presumption of correctness, and the petitioner has the burden of overcoming this presumption by clear and convincing evidence" (Thompkins, 698 F.3d at 983; Section 2254(e)).

All those things, then, provide the procedural matrix for consideration of Rosario's substantive claims. This opinion now turns to that task.

## Rosario's Claims

Rosario raises three claims for relief here: (1) that the trial court violated his

9

First Amendment rights by allowing evidence of gang affiliation when the crime was not gang related, (2) that his counsel was ineffective because of a failure to seek an instruction limiting the use of gang evidence or to preserve a "curative defense" and (3) that he was denied equal protection and due process because the trial judge did not comply with Illinois Supreme Court Rule ("Rule") 431(b) (Pet. 9-10). Those claims will be addressed seriatim.

**Claim One**

It should be noted at the outset that it is questionable whether the gang affiliation claim is cognizable on habeas review. This Court may examine only errors of federal law on habeas review--matters of state evidentiary law are not cognizable (Perruquet, 390 F.3d at 511). Although a First Amendment violation poses a federal constitutional issue, it is questionable whether Rosario has sufficiently laid out such a claim (see id. at 512-13). Nonetheless, construing the claim liberally as is called for by Rosario's pro se status (id. at 512), this Court will assume arguendo that the claim is cognizable for the sake of this analysis.

Even on that assumption, there is no doubt that the claim cannot succeed, for if a habeas petitioner fails to have presented the state courts with the same claim he is bringing in the federal court and the opportunity to raise that claim in state court has passed, the claim is procedurally defaulted (Lieberman v. Thomas, 505 F.3d 665, 669 (7th Cir. 2007)). It is not enough for the state claim and the federal claim to arise from the same facts--instead the federal court must ask "whether the petitioner has framed his claim in the state proceedings in a way that

brings to mind a specific constitutional right, and whether he has alleged a set of facts well within the mainstream of constitutional litigation" (id. at 670 (internal quotation marks omitted)). To that end the federal court must assess "whether the petitioner alerted the state court to the federal nature of his claim in a manner sufficient to allow that court to address the issue on a federal basis" (id. at 670, emphasis added).

That requirement has clearly not been met here. While Rosario did contend in the Illinois Appellate Court that the admission of gang evidence was improper, his arguments said nothing about the First Amendment (see Ans. Ex. B). Instead the Appellate Court dealt only with Rosario's contention that the jury should have been given certain instructions regarding the gang evidence as a matter of state law (Rosario, 2011 WL 10099316, at *7).[6] There is no mention of the First Amendment or any other federal right (id.). Hence Claim One has unquestionably been procedurally defaulted.

What remains for consideration, then, is whether that procedural default can be excused. Smith v. McKee, 598 F.3d 374, 382 (7th Cir. 2010) has put the well-

---

[6]In that respect Rosario pointed to an Illinois Supreme Court decision that upheld the admissibility of gang membership "only where there is sufficient proof that membership is related to the crime charged" (id.). But that holding actually supports admissibility in Rosario's case, for one of the charges against him expressly included gang membership as an ingredient that transformed his crime from "simple" unlawful use of a weapon to aggravated unlawful use of a weapon (720 ILCS 5/24-1 (6)(a)(3)(F), specifying as a transforming factor the element that "the person possessing the weapon is a member of street gang or is engaged in street gang related activity"). Interestingly, in December 2009 (after Rosario had been tried and convicted) the Illinois General Assembly deleted subsection (a)(3)(F) from the statute.

established operative standard succinctly:

> [A] federal court may excuse a procedural default if a petitioner can show either cause for the default and actual prejudice as a result of the alleged violation of federal law, or can demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice.

Because Rosario has pursued neither of those avenues in the Petition, it is equally plain that his just-explained procedural default cannot be excused (see Crockett v. Hulick, 542 F.3d 1183, 1193 (7th Cir. 2008)).

**Claim Two**

Rosario next makes an ineffective assistance of counsel claim, arguing that his counsel "failed to seek an instruction relevant to the limited use of gang evidence -- or preserve a curative defense upon the admissability [sic] of gang evidence" (Pet. 10). That same argument was rejected by the Illinois Appellate Court, which held that counsel's failure to seek a limiting instruction did not violate the standard set out in Strickland v. Washington, 466 U.S. 668 (1984) (Rosario, 2011 WL 10099316, at *8). On that score Respondent asserts that the state court's decision did not "result[ ] in a decision that was contrary to, or involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "result[ ] in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" (Section 2254(d)(1) and (2)).

To establish a claim for ineffective assistance of counsel, Rosario must demonstrate (1) that his counsel's performance fell below an objective standard of reasonableness and (2) that he was prejudiced by the deficient performance

12

(Strickland, 466 U.S. at 687). Under Strickland "[j]udicial scrutiny of counsel's performance is highly deferential, and under AEDPA we defer to the state court's application of Strickland on federal habeas review, meaning that our evaluation of counsel's performance is doubly deferential" (Thompkins, 698 F.3d at 986 (internal quotation marks omitted)). This Court asks not whether the state court's Strickland determination was correct, but rather only whether it was reasonable (Harrington v. Richter, 131 S. Ct. 770, 785 (2011)).

It is clear indeed that the state court's analysis here was not unreasonable. Rosario, 2011 WL 10099316, at *8 first correctly stated the two-pronged Strickland test. Then, even though the Appellate Court stated that "[w]e are not convinced that error occurred," it went on to hold that even if it were to assume arguendo that counsel's inaction did constitute an error, there was no prejudice because "the evidence was overwhelming and the outcome would have been the same" (id.).

True enough, the Appellate Court did not provide in-depth analysis of the first Strickland prong, stating only that it was "not convinced that error occurred." Given that minimal discussion, it may be debatable whether the "doubly deferential" AEDPA standard applies (see Quintana v. Chandler, No. 12-3125, 2013 WL 3800289, at *3-*4 (7th Cir. July 23)), but analysis shows that even under de novo review the claim does not survive.

As Rosario, 2011 WL 10099316, at *8 correctly noted, to show an error under Strickland the alleged error must be "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." In this case, as

13

already noted above, gang evidence was expressly required to supply an essential element of one of the crimes charged. Thus there is no question that the gang evidence was admissible.

That being so, the siutation was very different from one in which competent counsel should give active consideration to a limiting instruction -- say a case where gang membership is referred to only tangentially, so that the jury has to be cautioned against permitting it to divert attention from the question of guilt or innocence of a charged crime. Here there was no such reason for Rosario's counsel to consider seeking such a limiting instruction, and it is not really this Court's job to second-guess trial counsel's legitimate decisions (Strickland, 466 U.S. at 689-90). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment" (id. at 690), and in this case that presumption has not been overcome.

But even apart from what has just been said, it must be remembered that Strickland precribes a twofold test, in which the attacker must overcome both hurdles. And as for Strickland's prejudice prong, Rosario, 2011 WL 10099316, at *8 stated:

> [T]his evidence regarding gangs and defendant's conviction was
> properly admitted and the failure to provide a limiting instruction
> would not have resulted in a different verdict on the sundry counts.
> The evidence that defendant intended to shoot at someone in
> particular may be considered closely balanced; however, the evidence
> that defendant was a convicted felon and gang member who shot a gun
> in the direction of an occupied house was overwhelming.

To show prejudice a petitioner must demonstrate "a reasonable probability that, but

14

for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome" (Harrington, 131 S.Ct. at 787, internal quotation marks omitted).

In that regard the Illinois Appellate Court correctly stated the standard, and this Court cannot say that a reasonable court could not have come to the same conclusion. Indeed, it should be remembered that the jury <u>acquitted</u> Rosario on seven of the thirteen charges against him --hardly the action of a jury tainted by an assumption of guilt based on gang membership. Because the Appellate Court's determination in that respect was certainly not unreasonable, Claim Two also fails.

**Claim Three**

Finally, Rosario argues that he was denied due process because the trial court erred in failing to comply with Rule 431(b). Rule 431(b) states that during voir dire:

> The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her . . . .

That Rule goes on to specify that "[t]he court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Rosario argues the court erred by failing to ask each juror whether he or she understood the outlined principles.

15

Respondent counters with two arguments: (1) that Claim Three is not federally cognizable and (2) that the claim is procedurally defaulted. Both of those arguments are meritorious. It is axiomatic that "errors of state law in and of themselves are not cognizable on habeas review" (Perruquet, 390 F.3d at 511). "[O]nly if a state court's errors have deprived the petitioner of a right under <u>federal</u> law can the federal court intervene" (id., emphasis added). Matters of evidentiary rulings and jury instructions are usually beyond the scope of federal habeas review (id.), and this case is no exception. Rosario, 2011 WL 10099316, at *6 clearly stated that "[a] violation of Rule 431(b) does not implicate a fundamental right or constitutional protection, but only involves a violation of the supreme court's rules." Because the alleged error rises and falls solely on questions of state law and does not implicate any federal due process rights, it is not cognizable on habeas review.

Even if that were not so, the claim would still be procedurally defaulted. On that score a claim is procedurally defaulted when the "claim was presented to the state courts and the state-court ruling against the petitioner rests on adequate and independent state-law procedural grounds" (Perruquet, 390 F.3d at 514). Rosario, 2011 WL 10099316, at *5-*6 addressed Rosario's Rule 431 (b) argument but held that the argument was forfeited because he did not present his objection either during the voir dire or in his motion for a new trial and because the "plain error doctrine" did not apply so as to excuse forfeiture.

Procedural requirements such as those clearly qualify as independent and adequate state grounds (Holmes v. Hardy, 608 F.3d 963, 967 (7th Cir. 2010)). As Smith, 598 F.3d at 382 has explained:

16

> A state law ground that provides the basis for a state court decision is independent when the court actually relied on the procedural bar as an independent basis for its disposition of the case.

Here Rosario's discussion of the issue makes it plain that the court was "actually relying" on forfeiture as a basis for disposing of the claim (Rosario, 2011 WL 10099316, at *5-*6). Although Rosario, id. at *6 did touch briefly on the merits of the claim in its discussion of the applicability of the plain error doctrine, Kaczmarek v. Rednour, 627 F.3d 586, 592 (7th Cir. 2010) has reconfirmed our Court of Appeals' consistent holdings that "where a state court reviews a federal constitutional claim for plain error because of a state procedural bar . . . that limited review does not constitute a decision on the merits."

As for adequacy, "[a] state law ground is adequate when it is a firmly established and regularly followed state practice at the time it is applied" (Smith, 598 F.3d at 382). There is no doubt that the forfeiture rule is an established rule in Illinois state courts, and our Court of Appeals has acknowledged that it constitutes an adequate and independent state ground for procedural default (Miranda v. Leibach, 394 F.3d 984, 997 (7th Cir. 2005)).

As discussed earlier as to Claim One, it may be possible for some procedural defaults to be excused (Smith, 598 F.3d at 382), but Rosario has presented no argument as to why this Court should excuse his default. Claim Three is thus rejected as having been procedurally defaulted.

## Certificate of Appealability

Section 2254 Rule 11(a) requires this Court to issue or deny a COA when it enters a final order adverse to a habeas petition -- and it does indeed dismiss Rosarios's petition. Moreover, this Court holds that the crystal - clear basis for that dismissal obviates any need to direct the parties to submit arguments as to whether a COA should issue.

In that respect, if a claim is rejected on substantive grounds, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong" (Slack v. McDaniel, 529 U.S. 473, 484 (2000)). Claim Two, the only claim to be rejected on substantive grounds, does not meet that standard.

And where a claim is rejected on procedural grounds, as is the case regarding Claims One and Three), "a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling" (id.). That standard has not been met as to either of those claims, for the procedural hurdles were clearly not overcome in either instance.

In sum, no COA will be issued here. If Rosario seeks to carry his claims further, he must tender that issue to the Court of Appeals.

**Conclusion**

For the reasons set out at length in this opinion, Rosario's Petition is dismissed in its entirety. As stated at the outset, if Rosario believes that he can

18

submit additional information that would call for a change in this Court's analysis (a prospect that appears highly unlikely), Fed. R. Civ. P. 59(e) provides a nonextendable 28 day period within which he may do so.

_____
Milton I. Shadur
Senior United States District Judge

Date:September 9, 2013